## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEATH KALMANSON, derivatively on behalf of VENTURE GLOBAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL SABEL, SARAH BLAKE, RODERICK CHRISTIE, SARI GRANAT, ANDREW OREKAR, ROBERT PENDER, THOMAS J. REID, JIMMY STATON, JONATHAN THAYER, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, AND BofA SECURITIES, INC., <br><br> Defendants, <br><br> and <br><br> VENTURE GLOBAL, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-05417 <br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Heath Kalmanson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Venture Global, Inc. ("Venture" or the "Company"), files this Verified Shareholder Derivative Complaint against Michael Sabel ("Sabel"), Sarah Blake ("Blake"), Roderick Christie ("Christie"), Sari Granat ("Granat"), Andrew Orekar ("Orekar"), Robert Pender ("Pender"), Thomas J. Reid ("Reid"), Jimmy Staton ("Staton"), Jonathan Thayer ("Thayer"), (collectively, the "Individual Defendants"), Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), and BofA Securities, Inc. ("BofA"), (collectively, the "Underwriter Defendants" and together with the Individual Defendants and

1

Venture, the "Defendants") for breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Venture, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Venture's current and/or former officers and directors from January 24, 2025 to March 6, 2025, both dates inclusive (the "Relevant Period").

2.      Venture is an energy company dealing in Liquified Natural Gas ("LNG") sourced from North American natural gas basins. Venture has assets throughout the LNG supply chain including, but not limited to LNG production, natural gas transport, shipping and regasification.

3.      Venture is currently in the process of constructing five LNG facilities throughout the U.S. Gulf Coast, generally around Louisiana. Two specific projects of note are the Calcasieu Project and the Plaquemines Project.

4.     On January 23, 2025, Venture issued a press release announcing the pricing for its initial public offering ("IPO") stating, in relevant part:

> [Venture] announced today the pricing of its initial public offering of 70,000,000 shares of its Class A common stock, par value $0.01 ("Class A common stock") at a public offering price of $25.00 per share. In connection with the offering, Venture Global has granted the underwriters a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock are expected to begin trading on the New York Stock Exchange on January 24, 2025 under the symbol "VG".
>
> The closing of the offering is expected to occur on January 27, 2025, subject to the satisfaction of customary closing conditions.

5.     On January 27, 2025, the Company filed a Current Report on Form 8-K with the SEC to announce the close of its IPO. The statement included a second amended and restated certificate of incorporation, amended and restated by-laws, and amended and restated shareholders' agreement. The statement was signed by Defendant Thayer.

6.     Throughout the Relevant Period, the Company and its top executives made false and/or misleading statements regarding the Company's business and operations. Specifically, the Company represented that its business strategy was financially sound and backed by sufficient customer demand, despite significant delays and cost estimate increases throughout its natural gas projects.

7.     Further, on March 6, 2025, before the market opened, the Company issued a press release regarding its financial results for the fourth quarter and full-year ended December 31, 2024 noting an average earnings per share that fell below market expectations, decreasing sales, and increased cost estimates for the Plaquemines Project.

8.     On this news, the Company's stock price declined $5.12 per share, or approximately 36.06%, from a close of $14.20 per share on March 5, 2025 to a close of $9.08 per share on March 6, 2025, on unusually heavy trading volume.

9.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the Calcasieu Project's commissioning volumes were declining and had declined during the fourth quarter of 2024 at levels substantially greater than either the market's expectations or the Registration Statement's supposed warnings; (2) the Calcasieu Project continued to experience production issues resulting in further delays, reduction in production volumes, and negative customer relations; (3) Venture internally projected reductions in both production levels and income for 2025; (4) the Plaquemines Project cost estimates were considerably higher than the Registration Statement's estimate for the project, with a total cost of between $23.3 billion-$23.8 billion; (5) the Company's Registration Statement omitted its financial results for the fourth quarter and full fiscal year of 2024; and (6) the Registration Statement's warning of financial risk was insufficient. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

11.    The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Accounting Officer ("CAO"), its Board of Directors (the "Board"), and the underwriters

of the IPO to a securities class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Sabel's, Blake's, Christie's, Granat's, Orekar's, Pender's, Reid's, Staton's, Thayer's, Goldman Sachs', J.P. Morgan's, and BofA's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1).

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Venture. Plaintiff has continuously held Venture common stock at all relevant times.

### Nominal Defendant Venture

20.     Venture is a Delaware corporation with principal executive offices at 1001 19th Street North, Suite 1500, Arlington, Virginia 22209. Venture's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "VG."

### Defendant Sabel

21.     Defendant Sabel has served as the CEO, Executive Co-Chairman of the Board, and as a Company director since September 2023. Defendant Sabel also serves as the Chairman of the Compensation Committee and as the Chairman of the Nominating and Corporate Governance Committee.

22.     According to the Schedule 14A the Company filed with the SEC on April 3, 2025 (the "2025 Proxy Statement"), as of March 25, 2025, Defendant Sabel beneficially owned 1,968,604,458 shares of the Company's Class B Common stock through his position as Managing

Partner at Venture Global Partners II, LLC which represents 97.8% of the Company's total voting power, making Defendant Sabel a controlling shareholder.

23.     The 2025 Proxy Statement stated the following about Defendant Sabel:

Michael Sabel is one of the Company's co-founders. Mr. Sabel has served as the Company's Chief Executive Officer and as Executive Co-Chairman of the Company's Board since September 2023. Mr. Sabel has also served as the sole Chief Executive Officer of Venture Global LNG, Inc. ("VGLNG"), a wholly-owned subsidiary of the Company, since October 2020 and has served as Executive Co-Chairman of VGLNG's board of directors since August 2014. Mr. Sabel is also currently Managing Partner of Venture Global Partners II, LLC ("ex Partners"), the Company's controlling shareholder. Prior to founding Venture Global, Mr. Sabel spent decades working in the energy, technology and financial service sectors in senior leadership, new company formation, technology licensing and corporate business development. We believe Mr. Sabel is qualified to serve as director due to his experience as one of our co-founders and as our Chief Executive Officer, his decades of experience in capital markets transactions, his comprehensive experience in the energy, energy technology and financial services sectors and his in-depth knowledge of the issues, challenges, and opportunities facing us.

**Defendant Blake**

24.     Defendant Blake currently serves as the Company's CAO.

25.     The Venture corporate website stated the following about Defendant Blake:

Ms. Blake focuses on financial transformation, SEC reporting and technical accounting and has over 25 years of accounting experience across a wide range of businesses and firms. Prior to joining the company, Ms. Blake served in various capacities at The AES Corporation (NYSE: AES) from 2006 to 2020, most recently in her capacity as Vice President, Controller and Chief Accounting Officer from 2017 to 2020. Ms. Blake currently is a licensed Certified Public Accountant in Virginia.

**Defendant Christie**

26.     Defendant Christie has served as a Company Director since September 2023, and serves as a member of the Audit Committee.

27.     The 2025 Proxy Statement stated the following about Defendant Christie:

Roderick Christie has served on the Company's Board since September 2023 and has served on the board of directors of VGLNG, a wholly-owned subsidiary of the Company, since June 2023. Mr. Christie is a veteran of the electricity and energy

sectors, with over 30 years of international experience. From September 2022 to January 2023, Mr. Christie was Executive Vice President of Baker Hughes (Nasdaq: BKR), Industrial & Energy Technology business where he worked with business developments, manufactures and services of a wide range of technologies for the energy, aviation and automotive industries. Prior to that, from January 2016 to September 2022, Mr. Christie was Executive Vice President of Baker Hughes Turbomachinery and Process Solutions business. In 2017, Mr. Christie created and led the Baker Hughes Climate Technology Solutions, developing solutions for hydrogen, CCUS, integrated clean energy, and emissions management to support customers' net-zero emission ambitions and latterly integrated the Baker Hughes Controls, Sensing and Diagnostics businesses to create the Baker Hughes Industrial & Energy Technology Business. From June 2018 to February 2023, Mr. Christie served as a member of the board at Aero Alliance Products & Services LLC. Prior to Baker Hughes, Mr. Christie was President & CEO of GE Energy Subsea Solutions from June 2011 to December 2016, President of GE Energy Central & Eastern Europe, Russia and Central Asia from September 2004 to June 2011 and CEO of GE Energy Services Europe from June 1999 to September 2004. Before joining GE, he worked for 14 years at Scottish & Southern Energy (LSE: SSE) in the utility power sector, where he held a wide range of engineering, project development and management roles. Accordingly, Mr. Christie has developed significant global experience in the oil & gas, gas processing, LNG, refining, petrochemical and electricity sectors. We believe Mr. Christie is qualified to serve as director due to his decades of international experience in the electricity and energy sectors, and his extensive public company leadership experience within the energy industry.

**Defendant Granat**

28.     Defendant Granat has served as a Company Director since September 2023, and

serves as a member of the Nominating and Corporate Governance Committee.

29.     The 2025 Proxy Statement stated the following about Defendant Granat:

Sari Granat has served on the Company's Board since September 2023 and has served on the board of directors of VGLNG, a wholly-owned subsidiary of the Company, since January 2022. Ms. Granat has been president and chief operating officer of Chainalysis since 2022, the blockchain data platform, where she has managed the company's general and administrative functions, including finance, human resources, legal, information security and information technology and the company's sales organization. At Chainalysis, Ms. Granat works across the firm on strategies to advance the company's mission of bringing trust and transparency to the global cryptocurrency community. In addition, Ms. Granat currently serves on the board of Assurant, Inc. (NYSE: AIZ), a global provider of risk management products and services, where she serves on the board's Compensation and Talent Committee and Information Technology Committee. Ms. Granat has also served on the boards of ComplySci, a provider of regulatory technology solutions for the

financial services sector, and Opening Act, a nonprofit that advances arts equity by providing free theater programs to New York City's highest need public schools, the CxO Advisory Council for VMware and on the General Counsel Steering Committee for the National Association of Corporate Directors. From 2012 to 2022, Ms. Granat was with IHS Markit, a formerly NYSE-listed $45+ billion data, analytics and technology company prior to its merger with S&P Global in February 2022, where she most recently served as chief administrative officer and general counsel, leading information security, information technology, legal, risk management, privacy and compliance functions. From 2010 to 2012, Ms. Granat was chief administrative officer and head of business development at TheMarkets.com LLC, a financial technology and data provider. Prior to that role, Ms. Granat has served in a variety of legal and strategy positions with Dow Jones & Company, Kaplan, Inc., Skadden, Arps, Slate, Meagher & Flom LLP, and Kenyon & Kenyon. We believe Ms. Granat is qualified to serve as director due to her significant leadership and management experience within the financial technology and data analytics sectors, including her experience of more than 10 years general counsel of public companies and in risk management, privacy and information technology.

**Defendant Orekar**

30.    Defendant Orekar has served as a Company director since September 2023, and

serves as Chairman of the Audit Committee.

31.    The 2025 Proxy Statement stated the following about Defendant Orekar:

Andrew Orekar has served on the Company's Board since September 2023 and has served on the board of directors of VGLNG, a wholly-owned subsidiary of the Company, since September 2021. Mr. Orekar is the former Chief Executive Officer and Board Member of GasLog Partners (NYSE: GLOP-A), one of the world's largest LNG shipping companies. Appointed CEO at GasLog Partners' founding in 2014, Mr. Orekar led the company's IPO and oversaw its growth from three to fifteen vessels during his nearly seven years as CEO. Mr. Orekar worked at GasLog Partners in his capacity as CEO until 2020. Prior to joining GasLog Partners, Mr. Orekar served as Managing Director at Goldman, Sachs & Co., where he advised natural resources companies on mergers and acquisitions and capital markets transactions. Mr. Orekar joined Goldman Sachs in 1998 and held several leadership positions in the investment banking division. Mr. Orekar also previously served on the boards of directors of Tortoise Acquisition Corp. and Parabola Acquisition Corp. Following his tenure as CEO of GasLog Partners, Mr. Orekar has provided consulting services to investors and companies in the energy and shipping sectors. We believe Mr. Orekar is qualified to serve as director due to his extensive public company leadership experience in the LNG and maritime transport sectors and his deep knowledge of corporate transactions within the energy, shipping and financial services industries.

**Defendant Pender**

32.    Defendant Pender has served as Executive Co-Chairman, Executive Co-Chairman of the Board, and as a Company director since September 2023. Additionally, Defendant Pender serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

33.    According to the 2025 Proxy Statement, as of April 3, 2025, Defendant Pender beneficially owned 1,968,604,458 shares of the Company's Class B Common stock through his position as Managing Partner at Venture Global Partners II, LLC which represents 97.8% of the Company's total voting power, making Defendant Pender a controlling shareholder over matters .

34.    The 2025 Proxy Statement stated the following about Defendant Pender:

Robert (Bob) Pender is one of the Company's co-founders. Mr. Pender has served as an Executive Co-Chairman of the Company's Board since September 2023. Prior to October 2020, Mr. Pender served as Co-Chief Executive Officer of VGLNG, a wholly-owned subsidiary of the Company. Mr. Pender has also served as an officer of VGLNG as Executive Co-Chairman since October 2020 and as Executive Co-Chairman of VGLNG's board of directors since August 2014. Mr. Pender is also Managing Partner of VG Partners, the Company's controlling shareholder. Mr. Pender previously practiced law for over 28 years, specializing in alternative energy project finance, including during the early years of the sustainable energy transition in the U.S. Mr. Pender has worked on over $35 billion of energy, infrastructure and power projects, including cogeneration, biomass, wind, hydro, geothermal, LNG and nuclear. Prior to founding VGLNG, Mr. Pender previously served as a partner at Hogan Lovells, a global law firm, where he was the Chair and Practice Group Director of its Project & International Finance Group for a decade. Mr. Pender has led large-scale energy infrastructure transactions throughout North America, Central and South America, and South Asia, including representations of nation states, such as the Government of India (through its Ministry of Power), the Republics of Ecuador and Guyana and the People's Republic of China (through its state-owned enterprises, Sinosure and China Development Bank), lenders, equity investors and developers. Mr. Pender also provided several years of pro bono support to, among others, the American Red Cross for tsunami relief in South Asia, Accion for micro-finance capital projects in Africa and the Republic of Haiti, beginning with legal support to the Interim Haiti Recovery Commission, then serving as a counselor to the Minister Delegate for Energy Security, Republic of Haiti. We believe Mr. Pender is qualified to serve as director due to his experience as one of our co-founders, his decades of experience in law related to alternative

energy project finance, and his experience leading large-scale energy infrastructure transactions both domestically and internationally.

**Defendant Reid**

35.     Defendant Reid has served as a Company director since September 2023, and

serves as a member of the Compensation Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Reid:

Thomas Reid has served on the Company's Board since September 2023 and has served on the board of directors of VGLNG, a wholly-owned subsidiary of the Company, since January 2022. Mr. Reid is chief legal officer and secretary of Comcast Corporation (Nasdaq: CMCSA), a position he has held since April 2019. Mr. Reid oversees Comcast's legal, corporate governance and strategic intellectual property functions and the company's government and regulatory affairs and political affairs functions. Mr. Reid joined Comcast in 2019 after a successful career at Davis Polk & Wardwell, LLP. Mr. Reid began his career there in 1987 and served as chairman and managing partner of the firm from 2011 until his transition to Comcast. Mr. Reid also served as a Managing Director in the Investment Banking division of Morgan Stanley from 2000-2003. Mr. Reid's private legal practice and banking career were heavily focused on the global energy and utilities sector, advising on privatizations, mergers and acquisitions, financings and board investigations for leading international oil and gas companies and national oil companies. Mr. Reid serves as trustee for the Archdiocese of New York's Inner-City Scholarship Fund and as a trustee of the National Urban League. We believe Mr. Reid is qualified to serve as director due to his extensive leadership experience in legal advisory roles, including his role at public companies, law firms, and investment banks, as well as his deep knowledge of the global energy and utilities sector.

**Defendant Staton**

37.     Defendant Staton has served as a Company director since September 2023, and

serves as a member of the Audit Committee.

38.     The 2025 Proxy Statement stated the following about Defendant Staton:

Jimmy Staton has served on the Company's Board since September 2023 and has served on the board of directors of VGLNG, a wholly-owned subsidiary of the Company, since August 2014. Mr. Staton was formerly VGLNG's Executive Vice President from January 2015 to November 2016. Mr. Staton is currently the President and Chief Executive Officer of the South Carolina Public Service Authority (Santee Cooper), a state owned electric and water utility company that provides power directly or indirectly to 2 million South Carolinians and clean water

to over 200,000 customers, and has served in such capacity since March 2022. Prior to this, Mr. Staton served as President and CEO of Southern Star Central Corporation, a privately held natural gas pipeline company with assets throughout the Midwest United States, from 2017 to 2022. Additionally, Mr. Staton also served as Executive Vice President and Group CEO for NiSource, Inc. (NYSE: NI) from 2008 to 2014. Prior to his tenure at NiSource, Mr. Staton held several senior executive level positions at Dominion Resources, Inc. (NYSE: D) from 1993 to 2008. Mr. Staton has also been active in industry organizations having served on the board of directors for the Edison Electric Institute, the Interstate Natural Gas Association of America, the American Gas Association, the American Gas Foundation and the Southern Gas Association. We believe Mr. Staton is qualified to serve as director due to his extensive experience in the utilities sector, including leadership roles in gas distribution, electric and gas utilities and interstate gas pipelines businesses.

**Defendant Thayer**

39.     Defendant Thayer currently serves as the Company's CFO.

40.     The Venture corporate website states the following about Defendant Thayer:

Mr. Thayer has over 25 years of finance, strategy and mergers & acquisition leadership experience including serving as Chief Financial Officer at two Fortune 500 energy companies. Prior to joining the company, he served as Vice Chairman, Corporate Operations and Chief Financial Officer from 2019 to 2020 of Woodward, Inc. (Nasdaq: WWD), an independent designer, manufacturer, and service provider of control system solutions and components for the aerospace and industrial markets, as Chief Financial Officer from 2012 to 2018 of Exelon Corporation (Nasdaq: EXC), a leading utility, power marketing and generation holding company, and, from 2008 to 2012, Chief Financial Officer of Constellation Energy Group, Inc. (Nasdaq: CEG), a large, integrated energy company, with power generation, gas and electric distribution utilities and energy marketing and risk management services. Mr. Thayer has also held roles in investment banking, first with SBC Warburg Dillon Read, and subsequently with Deutsche Bank Securities.

**Underwriter Defendant Goldman Sachs**

41.     Defendant Goldman Sachs served as an underwriter for Venture's IPO and assisted in the drafting and dissemination of the Company's offering documents.

**Underwriter Defendant J.P. Morgan**

42.     Defendant J.P. Morgan served as an underwriter for Venture's IPO and assisted in the drafting and dissemination of the Company's offering documents.

**Underwriter Defendant BofA**

43.    Defendant BofA served as an underwriter for Venture's IPO and assisted in the drafting and dissemination of the Company's offering documents.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.    By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Venture and because of their ability to control the business and corporate affairs of Venture, the Individual Defendants owed Venture and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Venture in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Venture and its shareholders so as to benefit all shareholders equally.

45.    Each controlling shareholder, director, officer of the Company owes to Venture and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Venture, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.    To discharge their duties, controlling shareholders, officers and directors of Venture were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest

fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders directors, and officers of Venture, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Venture's Board at all relevant times.

49.      As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.      To discharge their duties, the controlling shareholders, officers and directors of Venture were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers and directors of Venture were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to Venture's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Venture conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Venture and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Venture's operations would comply with all applicable laws and Venture's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

51.      Each of the Individual Defendants further owed to Venture and the shareholders the duty of loyalty requiring that each favor Venture's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Venture and were at all times acting within the course and scope of such agency.

53.      Because of their advisory, executive, managerial, directorial, and controlling positions with Venture, each of the Individual Defendants had access to adverse, non-public information about the Company.

54.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Venture.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Venture was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Venture and was at all times acting within the course and scope of such agency.

## VENTURE'S CODE OF CONDUCT

60.    Venture's Code of Conduct states that it "it defines the key principles that guide relationships with our stockholders, business partners, employees, communities and other stakeholders[,]" and that its "commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government, the public, and our stockholders." The Code of Conduct notes that "[a]ll of our employees, officers and directors must hold one another and themselves accountable to comply with the language and spirit of this Code and seek to avoid even the appearance of improper behavior." The Code of Conduct further notes that "[o]ne of our Company's most valuable assets is our reputation for integrity, professionalism and fairness. Our actions are the foundation of our reputation, and adhering to this Code and applicable law is imperative."

61.    In the section titled "Our Guiding Principles," the Code of Conduct states the following:

> The Company is committed to becoming the world's leading producer of clean, low-cost liquefied natural gas. The following principles are reflected in this Code, shape our culture, and guide our relationships with our stockholders, business partners, employees, communities and other stakeholders.
>     • Commitment to safety: We continuously strive to protect the health and safety of our employees, contractors and customers, and the communities in which we operate.
>     • Prioritizing integrity: We hold ourselves to the highest standards of honesty and accountability.
>     • Engaging with others responsibly: We ensure that our communications and interactions with each other, our business partners and our

regulators are respectful, free from conflict and comply with all applicable laws and regulations.

         • Embracing innovation: We encourage the development of new ideas, collaboration, problem solving and ingenuity to support our continuing growth.

         • Purposeful focus:  Our business is underpinned by a purposeful focus that drives thoughtful and comprehensive analysis of issues that impact our stakeholders, leverages creativity, proactively addresses challenges and improves directed outcomes.

62.     In the section titled "Compliance with Laws, Rules, and Regulatory Requirements,"

the Code of Conduct states the following:

The Company's business and operations are subject to extensive regulation at the U.S. federal, state and local levels, and in certain foreign jurisdictions, and compliance with all applicable laws and regulations is fundamental to the Company.  We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations.  No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason, in the performance of their duties. Each employee, officer and director is responsible for understanding, respecting and complying with the laws, rules and regulations applicable to his or her duties at the Company, and is accountable for any violations thereof.

63.     In the subsection titled "Trading on Inside Information," the Code of Conduct states

the following:

Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", is illegal.  All non-public, company information should be considered inside information and should never be used for personal gain.  Our employees, officers and directors are required to familiarize themselves and comply with the Company's Statement of Policy Concerning Trading in Company Securities, copies of which are distributed to all employees, officers and directors and are available from the Legal Department.

64.     In the subsection titled "Quality of Public Disclosures," the Code of Conduct states

the following:

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations.  Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure.  The Company has established a Disclosure

Committee consisting of senior management to assist in preparing and monitoring such disclosures.

65.     In the subsection "Conflicts of Interest," the Code of Conduct states the following:

Our employees, officers and directors have an obligation to act in the best interests of the Company.  All employees, officers and directors should endeavor to avoid situations that present a potential or actual conflict between their interest and the interest of the Company.

A "conflict of interest" occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates.  A conflict of interest may arise when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively.  Conflicts of interest may also arise when an employee, officer or director (or his or her family members) receives improper personal benefits as a result of the employee's, officer's or director's position in the Company.

Situations that may constitute a conflict of interest include:

•  Working, in any capacity, for a competitor, customer or supplier while employed by the Company.
•  Accepting gifts of more than modest value or receiving personal discounts (if such discounts are not generally offered to the public) or other benefits as a result of your position in the Company from a competitor, customer or supplier.
•  Competing with the Company for the purchase or sale of property, products, services or other interests.
•  Having an interest in a transaction involving the Company, a competitor, a customer or supplier (other than as an employee, officer or director of the Company and not including routine investments in publicly traded companies).
•  Directing business to a supplier owned or managed by, or which employs, a relative or friend.

Persons other than directors and executive officers who have questions about any material transaction or relationship that reasonably could be expected to give rise to such a conflict should discuss the matter with, and seek a determination and prior authorization or approval from, their supervisor, the Chief Compliance Officer or any designee of the Chief Compliance Officer. A supervisor may not authorize or approve conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the Chief Compliance Officer or any designee of the Chief Compliance Officer with a written description of the activity and seeking the written approval of the Chief Compliance Officer or any designee of the Chief Compliance Officer. If the supervisor is himself or herself involved in the potential or actual conflict, the matter should instead be discussed directly with the Chief Compliance Officer or any designee of the Chief Compliance Officer. Directors and executive officers should exclusively report any

20

conflicts of interest to, or seek prior authorization or approval from, the Audit Committee of the Board.

66.     In the subsection "Corporate Opportunities," the Code of Conduct states the following:

> Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position.  No employee, officer or director may use corporate property, information or position for personal gain, and no employee, officer or director may compete with the Company.  Competing with the Company may involve engaging in the same line of business as the Company, or any situation where the employee, officer or director takes away from the Company opportunities for sales or purchases of products, services or interests.

67.     In the subsection "Fair Dealing," the Code of Conduct states the following:

> Each employee, officer and director of the Company should endeavor to deal fairly with customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices.  No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.  No bribes, kickbacks or other similar payments in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action.  The Company and any employee, officer or director involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this Code. Practices that are acceptable in a commercial business environment may be against the law or the policies governing U.S. federal, state, local, or foreign government employees.  Therefore, no gifts or business entertainment of any kind may be offered or given to any government employee, official, or regulator without the prior approval of the Legal Department. Except in certain limited circumstances, the Foreign Corrupt Practices Act ("FCPA") prohibits giving anything of value directly or indirectly to any "foreign official" for the purpose of obtaining or retaining business.  When in doubt as to whether a contemplated payment or gift may violate the FCPA, contact the Legal Department before taking any action.

68.     In the subsection titled "Reporting Violations," the Code of Conduct states the following:

> All employees, directors and officers are expected to comply with all of the provisions of this Code.  This Code will be strictly enforced and violations will be dealt with immediately.  In addition, from time to time, the Company will implement policies and practices that are consistent with the principles set forth in this Code, and any violation of any such Company policies will be considered a

violation of this Code. Violations of this Code that involve illegal behavior may be reported to the appropriate authorities. The Company encourages all employees, officers and directors to promptly report any suspected violations of this Code, and strongly urges the reporting of all instances of discrimination and harassment, which are strictly prohibited under Company policies.  The Company will promptly investigate any reports of violations of this Code and will take appropriate measures.  The Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith to the Company or to any governmental agency or entity or self-regulatory organization.  Open communication of issues and concerns by all employees without fear of retribution or retaliation is vital to the successful implementation of this Code.  All employees, officers and directors are required to cooperate in any internal investigations of misconduct and unethical behavior. Situations which may involve a violation of ethics, laws, rules, regulations or this Code may not always be clear and may require the exercise of judgment or the making of difficult decisions.  Employees, officers and directors should promptly report any concerns about a violation of ethics, laws, rules, regulations or this Code to the General Counsel or the Chief Compliance Officer or, in the case of accounting, internal accounting controls or auditing matters, in accordance with the Company's Policy for Reporting Concerns Related to Accounting, Auditing and Ethical Violations (Whistleblower Policy). Any such concerns involving the General Counsel or any executive officer or director should be reported to the Audit Committee of the Board. Interested parties may also communicate directly with the Company's non-management directors through contact information located in the Company's annual report on Form 10-K. Reporting of violations may also be done on a confidential or anonymous basis to AllVoices by submitting a report on https://ventureglobal.allvoices.co/ or by calling 1 (888) 483-9086. An anonymous report should provide enough information about the incident or situation to allow the Company to investigate properly. If concerns or complaints require confidentiality, including keeping an identity anonymous, the Company will endeavor to protect this confidentiality, subject to applicable law, regulation or legal proceedings.

The General Counsel and Chief Compliance Officer will have primary authority and responsibility for the enforcement of this Code, and the Company will devote the necessary resources to enable the General Counsel to establish such procedures as may be reasonably necessary to support a culture of accountability and facilitate compliance with the Code.  Questions concerning this Code should be directed to the General Counsel or to the Legal Department at legal@ventureglobalng.com. For more information about reporting such violations and protections afforded to you, please refer to the Company's Policy for Reporting Concerns Related to Accounting, Auditing and Ethical Violations (Whistleblower Policy) posted on the Company website.

69.     Under the subsection "Waivers," the Code of Conduct states the following:

The Nominating and Governance Committee may in limited circumstances grant a waiver of a Code provision.  However, any waiver of the provisions in this Code

for the General Counsel, the Chief Compliance Officer or any executive officer or director may only be granted by the Board or the Audit Committee of the Board and will promptly be disclosed to the Company's stockholders in accordance with the applicable U.S. federal securities and NYSE rules.   This Code will be posted on the Company website and the Company's annual report on Form 10K will report the posting and indicate that a copy of the Code will be provided to any shareholder who requests it.

70.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Securities Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## VENTURE'S AUDIT COMMITTEE CHARTER

71.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

> . . . assist the Board in its oversight of . . . the integrity of the Company's financial statements and internal controls . . . the qualifications, independence and performance of the Company's independent auditor . . . the design and implementation of the internal audit function . . . the Company's governance, policies, and processes for monitoring and mitigating risks . . . the review and approval of related party transactions required to be disclosed under Item 404 of Regulation S-K and the review and approval of policies and procedures pertaining to related-party transactions . . . the administration and oversight of the Company's compensation recovery policies; and . . . the Company's compliance with legal and regulatory requirements.

72.    Regarding the Company's independent auditor, the Audit Committee Charter lists the following responsibilities of the Audit Committee:

*Independent Auditor*

- The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (subject, if applicable, to stockholder ratification). Each such accounting firm shall report directly to the Committee.

- The Committee shall pre-approve the audit services and non-audit services (including the fees and terms thereof) to be provided by the Company's independent auditor pursuant to pre-approval policies and procedures established by the Committee. The Committee may delegate its authority to pre-approve services to the Chair of the Committee or one or more Committee members, provided that such designees present any such approvals to the full Committee at the next Committee meeting.

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the planned scope and timing of the independent auditor's annual audit plan(s) and discuss significant findings from the audit and any problems or difficulties encountered, including any restrictions on the scope of the auditor's activities or on access to requested information, and any significant disagreements with management.

- The Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditor to the full Board on at least an annual basis. As part of such evaluation, at least annually, the Committee shall:

  - obtain and review a report or reports from the Company's independent auditor:
    - describing the independent auditor's internal quality-control procedures

    - describing any material issues raised by (i) the most recent internal quality-control review, peer review or Public Company Accounting Oversight Board ("PCAOB") review, of the independent auditing firm, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditing firm; and any steps taken to deal with any such issues;

    - describing all relationships between the independent auditor and the Company consistent with applicable requirements of

> the PCAOB regarding the independent auditor's communications with the audit committee concerning independence;

- confirm and evaluate the rotation of the audit partners on the audit engagement team as required by law;

- The Committee shall establish policies for the Company's hiring of current or former employees of the independent auditor.

73. Regarding the Company's internal auditors, the Audit Committee Charter lists the following responsibilities of the Audit Committee:

*Internal Auditors*

- The Committee shall review management's plans with respect to the responsibilities, budget and staffing of the internal audit function and its plans for the implementation of the internal audit function. The review shall include a discussion of those plans with the independent auditors.

74. Regarding the Company's financial statements, disclosures and other risk management and compliance matters, the Audit Committee Charter lists the following responsibilities of the Audit Committee:

*Financial Statements; Disclosure and Other Risk Management and Compliance Matters*

- The Committee shall meet to review and discuss with management and the independent auditor the annual audited financial statements and unaudited quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-K or Form 10-Q with the SEC.

- The Committee shall review with management, personnel responsible for the design and implementation of the internal audit function and the independent auditor:

  - any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the

effects of alternative Generally Accepted Accounting Principles ("GAAP") methods on the financial statements;

- the critical accounting policies and practices of the Company;

- the effect of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements; and

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- The Committee, or the Chair of the Committee, shall review the type and presentation of information included in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

- The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, review the Company's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

- The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the auditor pursuant to established auditing standards, as amended.

- In connection with its oversight responsibilities, the Committee shall be directly responsible for the resolution of disagreements between management and the auditor regarding the Company's financial reporting.

- The Committee shall review the Company's policies and practices with respect to risk assessment and risk management, including with respect to the oversight of risks from cybersecurity threat and discuss with management the Company's major financial and other risk exposures ("**Key Risks**") and the steps that have been taken to monitor and control such exposures.

26

- In furtherance of these purposes, the Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe; however, risk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports described below. The Committee may, as and to the extent it determines appropriate, review with management and take action with respect to:

  - setting the tone and developing a culture within the Company regarding Key Risks, promoting open risk discussion, and promoting integration of risk management into the Company's processes and goals;

  - the Company's risk identification, risk assessment, risk tolerance and risk mitigation and management practices for addressing Key Risks, and the guidelines, policies, procedures, processes and training for these undertakings;

  - management's implementation of the risk policies, procedures and training reviewed with the Committee;

  - reports and presentations provided by management regarding the effectiveness of management's undertakings with respect to the identification, assessment, mitigation, and management of Key Risks;

  - the oversight and review of any management led investigations and/or the undertaking of any Committee or Board led investigations or review of advice and counsel received from third party advisors, which the Committee will have the power to engage in its reasonable discretion; and

  - other matters as the Board determines relevant to the Committee's oversight of Key Risks assessment, mitigation, training and management.

- The Committee shall establish procedures for:

  - the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and

- the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- The Committee shall prepare the Committee report that the SEC rules require to be included in the Company's annual proxy statement.

75.    Regarding the Company's related party transactions, the Audit Committee Charter lists the following responsibilities of the Audit Committee  :

*Related Party Transactions*

- The Committee will review and approve related party transactions required to be disclosed under Item 404 of Regulation S-K and review and approve policies and procedures pertaining to related-party transactions.

- The Committee shall review potential conflicts of interest involving directors, including whether such director or directors may vote on any issue as to which there may be a conflict.

76.    Regarding the Company's compensation recovery policies, the Audit Committee Charter lists the following responsibilities of the Audit Committee:

*Compensation Recovery Policies*

- The Committee will administer and oversee the Company's Financial Restatement Compensation Recoupment Policy and any other Company policies regarding the recoupment, repayment or forfeiture of compensation, including any such policies required to be adopted pursuant to applicable laws and regulations and SEC and NYSE rules and standards.

77.    Regarding the Company's reporting to the Board, the Audit Committee Charter lists the following responsibilities of the Audit Committee:

*Reporting to the Board*

- The Committee shall report to the Board periodically. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the Key Risks, the design and implementation of the internal audit function and any other matters that the Committee deems appropriate or is requested to include by the Board.

- At least annually, the Committee shall evaluate its own performance and report to the Board on such evaluation.

78.    In the section titled "Authority and Delegations," the Audit Committee Charter states the following:

> The Committee is authorized (without seeking Board approval) to retain special legal, accounting or other advisers and may request any officer or employee of the Company or the Company's outside counsel or independent auditor to meet with any members of, or advisers to, the Committee.

> The Committee shall have available appropriate funding from the Company as determined by the Committee for payment of:

> - compensation to any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company;

> - compensation to any advisers employed by the Committee; and

> - ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

> The Committee may delegate its authority, including to subcommittees consisting solely of one or more members of the Committee, to the Chair of the Committee or to other individuals when it deems it appropriate and in the best interests of the Company and when such delegation would not violate applicable law, regulation or the securities exchange on which the Company's securities are listed or SEC requirements.

79.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without

misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

80.     Venture is an energy provider with a focus on the delivery of low-cost, long-term U.S. LNG sourced from North American natural gas basins. Venture has assets throughout the LNG supply chain including but not limited to LNG production, natural gas transport, shipping and regasification.

81.     Notably, Venture is in the process of creating five natural gas liquefaction and export facilities throughout the U.S. Gulf Coast near Louisiana. Two specific projects of note are the Calcasieu Project and the Plaquemines Project.

82.     The Calcasieu and Plaquemines projects feature unique arrangements to liquify natural gas. As opposed to between two to three large scale liquefaction trains, the Calcasieu and Plaquemines projects feature eighteen and thirty-six mid-scale liquefaction trains. The Company has stated that it plans to reuse this approach in subsequent projects.

83.     The Company announced its first successful cargo loading and departure from the Calcasieu Project on March 1, 2022, slightly over two and a half years from the Company's final investment decision in the project.

84.     The Company announced its first successful cargo loading and departure from the Plaquemines Project on December 26, 2024, slightly over two and a half years from the Company's final investment decision for the project's first phase.

85.     On January 23, 2025, Venture issued a press release to announce the pricing for its IPO stating, in relevant part:

[Venture] announced today the pricing of its initial public offering of 70,000,000 shares of its Class A common stock, par value $0.01 ("Class A common stock") at a public offering price of $25.00 per share. In connection with the offering, Venture Global has granted the underwriters a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock are expected to begin trading on the New York Stock Exchange on January 24, 2025 under the symbol "VG".

The closing of the offering is expected to occur on January 27, 2025, subject to the satisfaction of customary closing conditions.

86.    On January 27, 2025, the Company filed a Current Report on Form 8-K with the SEC to announce the close of its IPO. The statement included a second amended and restated certificate of incorporation, amended and restated by-laws, and amended and restated shareholders' agreement. The statement was signed by Defendant Thayer.

## FALSE AND MISLEADING STATEMENTS

### December 20, 2024 Registration Statement

87.    On approximately December 20, 2024, Venture filed a Registration Statement on Form S-1 with the SEC. On January 24, 2025, following several amendments, Venture and the Underwriter Defendants assessed the IPO and filed the IPO's final Prospectus, forming part of the Registration Statement (collectively, the "Registration Statement").

88.    The Registration Statement was reviewed, approved, and signed by Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, and Thayer. Venture's IPO listed for sale 70 million shares of the Company's common stocks at an offering price of $25.00 per share.

89.    The Registration Statement characterized Venture's overall business strategy in positive light stating, in relevant part:

Venture Global has fundamentally reshaped the development and construction of liquefied natural gas production, establishing us as a rapidly growing company delivering critical LNG to the world. Our innovative and disruptive approach, which is both scalable and repeatable, allows us to bring LNG to a global market years faster and at a lower cost. We believe supplying this clean, affordable fuel promotes global energy security and is essential to meeting growing global demand.

90.     The Registration Statement detailed the scale and implications of Venture's LNG

projects stating, in relevant part:

> We are commissioning, constructing, and developing five natural gas liquefaction
> and export projects near the Gulf of Mexico in Louisiana, utilizing our unique
> "design one, build many" approach. Each project is designed or is being developed
> to include an LNG facility and associated pipeline systems that interconnect with
> several interstate and intrastate pipelines to enable the delivery of natural gas into
> the LNG facility. As illustrated by the chart below, our five current projects are
> being designed to deliver a total expected peak production capacity of 143.8 mtpa,
> which consists of an aggregate of 104.4 mtpa expected nameplate capacity and an
> aggregate of 39.4 mtpa of expected excess capacity. These amounts do not account
> for any potential bolt-on expansion liquefaction capacity. The expected nameplate
> capacity of our facilities measures the minimum operating performance thresholds
> guaranteed by the equipment providers, and the expected excess capacity represents
> the additional LNG that we aim to produce above such guaranteed amounts.
> Although COD has not yet occurred under the post-COD SPAs for any of our
> projects, we have been generating proceeds from the sale of commissioning cargos
> at the Calcasieu Project since the first quarter of 2022, and expect to do so at each
> of our other projects during commissioning prior to achieving COD for the relevant
> project or phase of a project.

| Project Name | Number of Trains | Expected Nameplate Capacity | Expected Excess Capacity | Expected Peak Production Capacity | Stage of Development |
|---|---|---|---|---|---|
| Calcasieu Project | 18 | 10.0 mtpa | 2.4 mtpa[1] | 12.4 mtpa[1] | Commissioning |
| Plaquemines Project | 36 | 20.0 mtpa | 7.2 mtpa[1] | 27.2 mtpa[1] | Construction and Commissioning |
| CP2 Project | 36 | 20.0 mtpa[2] | 8.0 mtpa[2] | 28.0 mtpa[2] | Engineering, Procuring Materials, and Manufacturing Modules |
| CP3 Project | 54 | 30.0 mtpa[2] | 12.0 mtpa[2] | 42.0 mtpa[2] | Development |
| Delta Project | 44 | 24.4 mtpa[2] | 9.8 mtpa[2] | 34.2 mtpa[2] | Development |

91.     The Registration Statement noted that the Company makes LNG sales during the

development of its projects, prior to commercial operation. The Registration Statement stated:

> By design, conventional, stick-built projects generally only engage in several
> months of commissioning production, thereby limiting the number of cargos
> produced before full commercial operations occur. Due to our unique modular
> development approach and configuration consisting of many mid-scale liquefaction
> trains, which are delivered and installed sequentially, it is necessary to commission
> and test our LNG facilities sequentially over a longer period of time than traditional
> LNG facilities with substantially fewer, larger-scale liquefaction trains. The
> commissioning of the liquefaction trains at our facilities begins while portions of
> our facilities remain under construction.

> This important reliability and technical requirement results in earlier production of
> LNG than with traditional LNG facilities. We believe this earlier production of
> LNG positions us to produce a substantial number of commissioning cargos for

each of our LNG projects, generating proceeds that may be used to support any remaining construction work or fund subsequent projects and future growth. As an example of this, on March 1, 2022, we announced the successful loading and departure of our first cargo of LNG from the Calcasieu Project, just over two and a half years from our final investment decision for the project. By September 30, 2024, we had loaded and sold 342 LNG commissioning cargos and received approximately $19.6 billion in gross proceeds from such commissioning cargos.

92.    When discussing the Company's sales and purchases agreements relating to LNG

projects, the Registration Statement stated the following:

The project companies for the Calcasieu Project, the Plaquemines Project and the CP2 Project have signed LNG sales and purchase agreements, or SPAs, to sell LNG based on a pre-determined pricing formula that commences after we achieve the commercial operations date, or COD, of the relevant project or phase thereof. Under each such post-COD SPA, COD does not occur unless the applicable project company has notified such customer that (i) all of the project's facilities have been completed and commissioned, including any ramp up period, and (ii) the project is capable of delivering LNG in sufficient quantities and necessary quality to perform all of its obligations under such post-COD SPA.

As of September 30, 2024, we have executed 39.25 mtpa of such post-COD SPAs with a well recognized set of third-party customers that we believe constitute one of the strongest portfolios of institutional LNG buyer credits in the world. Approximately 95% of our contracted post-COD SPAs – or 37.45 mtpa of such 39.25 mtpa – are 20-year fixed price agreements, providing a long-term stream of contracted cash flow. We have also executed 1.8 mtpa of post-COD SPAs on a short- and medium-term basis and we plan to continue to optimize our portfolio balancing profit, duration, and risk.

93.    In addition, the Registration Statement claimed to caution against the volatility of

proceeds derived from the commissioning of LNG sales, stating:

Historical proceeds from the sale of commissioning cargos at the Calcasieu Project, which has had an extended commissioning period due to unanticipated challenges with equipment reliability that we are in the process of remediating, may not be indicative of the duration of the commissioning period or the amount of proceeds for any future period or for any of our other projects. See "Business – Our Liquefaction and Export Projects and Key, Complementary Assets – Calcasieu Project." Although we have included targeted COD dates for our projects and phases thereof, there can be no assurance that COD will not occur earlier or later than such targets. See "Business – Our Liquefaction and Export Projects and Key, Complementary Assets." If COD occurs earlier than expected for a particular project or phase thereof, it would adversely impact our ability to generate proceeds from the sale of commissioning cargos, which, subject to market conditions, may otherwise be more valuable than the revenues earned under our post-COD SPAs.

\* \* \*

As a result, we have experienced, and expect to continue to experience during the remainder of the commissioning phase, significant volatility in the proceeds we have generated from the sales of commissioning cargos from the Calcasieu Project. Since we began generating proceeds from the sale of commissioning cargos in the first quarter of 2022, our quarterly gross proceeds have fluctuated from a maximum of $2.9 billion ($2.4 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended March 31, 2023, to a minimum of $1.0 billion ($0.7 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended September 30, 2023. Accordingly, the proceeds we have generated from such sales of commissioning cargos of the Calcasieu Project to date may not be indicative of the duration of the commissioning period or the amount of proceeds from such sales for any future period for the Calcasieu Project or for any of our other projects. As a result, such proceeds, and also our operating results more generally, may vary significantly from one fiscal period to the next comparable fiscal period. Moreover, if we are not able to generate proceeds from the sale of commissioning cargos in the future that are comparable to such proceeds from the Calcasieu Project in the past, that could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.

94.    The Registration Statement also discussed the completion costs of the Plaquemines Project, stating:

We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024.

95.    The statements in ¶¶ 89-94 were materially false and misleading which failed to disclose, *inter alia*, that: (1) the Calcasieu Project's commissioning volumes were declining and had declined during the fourth quarter of 2024 at levels substantially greater than either the market's expectations or the Registration Statement's supposed warnings; (2) the Calcasieu Project continued to experience production issues resulting in further delays, reduction in production volumes, and negative customer relations; (3) Venture internally projected reductions in both production levels and income for 2025;   (4) the Plaquemines Project cost estimates were considerably higher than the Registration Statement's estimate for the project, with a total cost of

between $23.3 billion-$23.8 billion; (5) the Company's Registration Statement omitted its financial results for the fourth quarter and full fiscal year of 2024; and (6) the Registration Statement's warning of financial risk was insufficient. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

96.     The truth emerged on March 6, 2025, before the market opened, when the Company issued a press release regarding its financial results for the fourth quarter and full year ended December 31, 2024. Notably, news reports observed that the Company's posted earnings per share missed the average analyst estimate of $0.76 per share on revenues of $1.92 billion, having only posted an earnings per share of $0.33 on revenue of $1.52 billion. New reports further observed that Venture had substantially increased its cost estimates for the Plaquemines Project and that sales had unexpectedly fallen 6.7% year-over-year in the period.

97.     On this news, the Company's stock price declined $5.12 per share, or approximately 36.06%, from a close of $14.20 per share on March 5, 2025 to a close of $9.08 per share on March 6, 2025, on unusually heavy trading volume.

## SUBSEQUENT DEVELOPMENTS

98.     Venture is currently in the midst of legal actions from major clients such as Shell and BP, on account of delays in the commissioning of the Company's projects and thus lack of LNG production.

## DAMAGES TO VENTURE

99.     As a direct and proximate result of the Individual Defendants' conduct, Venture will lose and expend many millions of dollars.

100.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

101.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

102.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

103.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

104.    As a direct and proximate result of the Individual Defendants' conduct, Venture has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

105.    Plaintiff brings this action derivatively and for the benefit of Venture to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Venture, gross

mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Securities Act.

106.    Venture is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107.    Plaintiff is, and has been at all relevant times, a shareholder of Venture. Plaintiff will adequately and fairly represent the interests of Venture in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

109.    A pre-suit demand on the Board of Venture is futile and, therefore, excused. At the time of filing of this complaint, the Board consisted of the following seven individuals: Defendants Sabel, Christie, Granat, Orekar, Pender, Reid, and Staton (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

110.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

111.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Venture to issue false and misleading statements which were intended to make Venture appear more profitable and attractive to investors in light of the Company's IPO. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

112.    Additional reasons that demand on Defendant Sabel is futile follow. Defendant Sabel is a founder of the Company, and has served as the Company's CEO, the Executive Co-Chairman of the Board, and as a Company director since September 2023. Additionally, Defendant Sabel serves as Chairman of the Compensation Committee and as the Chairman of the Nominating and Corporate Governance Committee. Defendant Sabel is also a controlling shareholder of the Company. The Company provides Defendant Sabel with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Sabel is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Sabel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Christie is futile follow. Defendant Christie has served as a Company director since September 2023, and serves as a member of the Audit Committee. Defendant Christie has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Christie is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Christie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Granat is futile follow. Defendant Granat has served as a Company director since September 2023, and serves as a member of the Nominating and Corporate Governance Committee. Defendant Granat has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Granat is named as a defendant in the Securities Class Action. Further, she signed the materially false and misleading Registration Statement. For these reasons, Defendant Granat breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Orekar is futile follow. Defendant Orekar has served as a Company director since September 2023, and serves as the Chairman of the Audit Committee. Defendant Orekar has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Orekar is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Orekar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Pender is futile follow. Defendant Pender is a Company founder and has served as Executive Co-Chairman, Executive Co-Chairman of the Board, and a Company director since September 2023. Additionally, Defendant Pender serves as a member of the Nominating and Corporate Governance Committee. Defendant Pender is also a controlling shareholder. The Company provides Defendant Pender with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As a trusted Company officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Pender is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Pender breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Reid is futile follow. Defendant Reid has served as a Company director since September 2023, and serves as a member of the Compensation Committee. Defendant Reid has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Reid is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Reid breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Staton is futile follow. Defendant Staton has served as a Company director since September 2023, and serves as a member of the Audit Committee. Defendant Staton has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Staton is named as a defendant in the Securities Class Action. Further, he signed the materially false and misleading Registration Statement. For these reasons, Defendant Staton breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on the Board is futile follow.

120.    Defendants Orekar (as Chair), Christie, and Staton (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Securities Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

121.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Securities Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report

known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

122.    Venture has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Venture any part of the damages Venture suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

123.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

124.    The acts complained of herein constitute violations of fiduciary duties owed by Venture's controlling shareholders, officers and directors, and these acts are incapable of ratification.

125.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Venture. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Venture, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

126.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Venture to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

127.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>
### Against the Individual Defendants for Breach of Fiduciary Duties

126.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Venture's business and affairs.

128.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

129.    The Individual Defendants' conduct set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Venture.

130.    In breach of their fiduciary duties owed to Venture, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Calcasieu Project's commissioning volumes were declining and had declined during the fourth quarter of 2024 at levels substantially greater than either the market's expectations or the Registration Statement's supposed warnings; (2) the Calcasieu Project continued to experience production issues resulting in further delays, reduction in production volumes, and negative customer relations; (3) Venture internally projected reductions in both production levels and income for 2025; (4) the Plaquemines Project cost estimates were considerably higher than the Registration Statement's estimate for the project, with a total cost of between $23.3 billion-$23.8 billion; (5) the Company's Registration Statement omitted its financial results for the fourth quarter and full fiscal year of 2024; and (6) the Registration Statement's warning of financial risk was insufficient. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

131.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

132.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

133.    The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Venture's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

134.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Venture has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136.    Plaintiff, on behalf of Venture, has no adequate remedy at law.


## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Venture.

139.    The Individual Defendants either benefitted financially from the improper conduct,

or received bonuses, stock options, or similar compensation from Venture that was tied to the performance or artificially inflated valuation of Venture or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

140.    Plaintiff, as a shareholder and a representative of Venture, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

141.    Plaintiff, on behalf of Venture, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Venture, for which they are legally responsible.

144.    As a direct and proximate result of the Individual Defendants' abuse of control, Venture has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Venture has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of Venture, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

147.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Venture in a manner consistent with the operations of a publicly held corporation.

148.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Venture has sustained and will continue to sustain significant damages.

149.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

150.    Plaintiff, on behalf of Venture, has no adequate remedy at law.

## FIFTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

153.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Venture to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

154.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

155.    Plaintiff, on behalf of Venture, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants and Underwriter Defendants for Contribution Under Section 11(f) of the Securities Act**

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Venture shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

158.    Federal law provides Venture with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

159.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

160.    Venture is the registrant for the IPO. Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, Thayer, Goldman Sachs, J.P. Morgan, and BofA were responsible for the contents and dissemination of the Registration Statement.

161.    As issuer of the shares, Venture is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

162.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

163.    Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, Thayer, Goldman Sachs, J.P. Morgan, and BofA, because of their positions of control and authority as officers, directors, and/or underwriters of Venture, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Venture, including the wrongful acts complained of herein and in the Securities Class Action.

164.    Accordingly, Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, Thayer, Goldman Sachs, J.P. Morgan, and BofA are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution.

165.    As such, Venture is entitled to receive all appropriate contribution or indemnification from Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, Thayer, Goldman Sachs, J.P. Morgan, and BofA.

## PRAYER FOR RELIEF

166.    FOR THESE REASONS, Plaintiff demands judgement in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Venture, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Venture;

(c)    Determining and awarding to Venture the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Venture and the Individual Defendants to take all necessary actions to reform and improve Venture's corporate governance and internal procedures to comply

with applicable laws and to protect Venture and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       2. a provision to permit the shareholders of Venture to nominate at least four candidates for election to the Board; and

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (e)    Awarding Venture restitution from the Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2025

                     Respectfully submitted,

                     **THE BROWN LAW FIRM, P.C.**

                     */s/Timothy Brown*

Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Heath Kalmanson, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30 day of June, 2025.

DocuSigned by:

X 75AB9C757D314A9...

Heath Kalmanson